**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

MARGIE L. BUFFIN,

      Plaintiff,

vs.                                                    CASE NO. 3:05-cv-01289-J-TEM

MICHAEL J. ASTRUE,[1]
Commissioner of Social Security,

      Defendant.

_____

## <u>ORDER AND OPINION</u>

      This matter is before the Court on Plaintiff's complaint (Doc. #1), seeking review of the final decision of the Commissioner of the Social Security Administration (the Commissioner) denying her claim for disability insurance benefits (DIB). Plaintiff has filed a memorandum of law in support of her position (Doc. #15).[2] Defendant filed a memorandum of law in support of his position (Doc. #16). Both parties have consented to the exercise of jurisdiction by a magistrate judge, and the case has been referred to the undersigned by an Order of Reference dated April 6, 2007 (Doc. #14). The Commissioner has filed the Transcript of the proceedings (hereafter, identified as "Tr." followed by the appropriate page number). The Court has reviewed and given due consideration to the record in its entirety, including the parties' arguments presented in their briefs and the materials provided in the transcript of the underlying proceedings. Upon review of the

_____

[1]On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security. Pursuant to Rule 25, Federal Rules of Civil Procedure, Michael J. Astrue is substituted as Defendant herein.

[2]Hereafter, the Court will identify Plaintiff's brief as "P's brief" and Defendant's brief as "D's brief."

record, the Court finds the issues raised by Plaintiff were fully briefed and determined oral argument would not benefit the Court in making its determinations.  Accordingly, the matter has been decided on the written record.   For the reasons set out herein, the Commissioner's decision is **REVERSED AND REMANDED**.

**Procedural History**

In the instant action, Plaintiff filed an application for disability insurance benefits on July 18, 2003 (Tr. 269-71).  After being denied initially and upon reconsideration, Plaintiff requested a hearing, which was held on April 25, 2005 before Administrative Law Judge (ALJ) Melvin D. Benitz (Tr. 316-56).  Plaintiff appeared and testified at the hearing, as did vocational expert Paul Dolan (Tr. 316-56).  Plaintiff was represented by Mr. Gil Spruance, a non-attorney, during the underlying administrative phase of this case (Tr. 6).  On May 19, 2005, ALJ Benitz issued a hearing decision denying Plaintiff's claim (Tr. 12-25).  The Appeals Council (AC) denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner (Tr. 3-5).  Plaintiff's current counsel of record, Mr. L. Jack Gibney, Esquire, filed the instant action in federal court on December 19, 2005 (Doc. #1, Complaint).

**Standard of Review**

A plaintiff is entitled to disability benefits under the Social Security Act when he or she is unable to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to either result in death or last for a continuous period of not less than 12 months.  20 C.F.R. § 404.1505.[3]

---

[3]All references made to 20 C.F.R. will be to the 2007 edition unless otherwise specified.

The Commissioner has established a five-step sequential evaluation process for determining whether a plaintiff is disabled and therefore entitled to benefits. *See* 20 C.F.R. § 404.1520(a)(4); *Crayton v. Callahan*, 120 F. 3d 1217, 1219 (11th Cir. 1997). Plaintiff bears the burden of persuasion through Step 4, while at Step 5 the burden shifts to the Commissioner. *Bowen v. Yuckert*, 482 U.S. 137, 146 (1987). The scope of this Court's review is generally limited to determining whether the ALJ applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence. *See also Richardson v. Perales*, 402 U.S. 389, 390 (1971).

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is defined as more than a scintilla—*i.e.*, the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (*citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982)).

Where the Commissioner's decision is supported by substantial evidence, the Court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560.

The Commissioner must apply the correct law and demonstrate that he has done

3

so.  While the Court reviews the Commissioner's decision with deference to the factual findings, no such deference is given to the legal conclusions.  *Keeton v. Dep't of Health & Human S*erv's., 21 F.3d 1064, 1066 (11th Cir. 1994) (*citing Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)).   Therefore, in determining whether the Commissioner's decision is supported by substantial evidence, the reviewing court must not re-weigh the evidence, but must determine whether the record, as a whole, contains sufficient evidence to permit a reasonable mind to conclude that the plaintiff is not disabled.  *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

As in all Social Security disability cases, the plaintiff bears the ultimate burden of proving disability, and is responsible for furnishing or identifying medical and other evidence regarding her impairments.  *Bowen*, 482 U.S. at 146 n.5; *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991); *McSwain v. Bowen*, 814 F.2d 617, 619 (11th Cir. 1987); 42 U.S.C. § 423(d)(5) ("[a]n individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require").   It is a plaintiff's burden to provide the relevant medical and other evidence that he or she believes will prove they suffer from disabling physical or mental functional limitations.  20 C.F.R. § 404.704.

**Analysis**

Plaintiff is a forty-nine year old female, with a past relevant work history as a receptionist, nurse's assistant and home health aide (Tr. 319-23).  Plaintiff raises two issues on appeal.  First, Plaintiff asserts the physical residual functional capacity (RFC) assessed by the ALJ is not supported by substantial evidence (P's brief at 5).   In this regard, Plaintiff specifically contends ALJ Benitz committed reversible error in failing to

4

denote what weight, if any, was given to the medical opinions of two treating physicians (P's brief at 6).  Second, Plaintiff alleges the mental residual functional capacity assessed by the ALJ is not supported by substantial evidence (P's brief at 6-8).   In this regard, Plaintiff specifically alleges the ALJ committed reversible error in rejecting the opinion of Plaintiff's treating psychiatrist (P's brief at 7-8).   Plaintiff further contends the ALJ improperly evaluated the opinion of Plaintiff's examining psychologist and improperly assessed Plaintiff's daily living restrictions in determining her mental RFC (P's brief at 7).

Defendant argues substantial evidence supports the ALJ's assessment of Plaintiff's physical and mental RFC and his conclusion that Plaintiff could perform her past relevant work and was not disabled within the meaning of the Social Security Act (D's brief at 4-5). Defendant also argues the ALJ properly considered the relevant evidence in assessing the credibility of Plaintiff's allegations and properly performed his duty as the trier of fact weighing and resolving any conflicts in the evidence (D's brief at 4).

Upon review of the ALJ's decision and the record evidence, the Court finds ALJ Benitz erred in failing to state the weight afforded to the medical opinion evidence of Cecilia Olazar, M.D. and this case must be remanded for further proceedings.

**Plaintiff's Physical Residual Functional Capacity and Treating Physicians' Opinions**

Plaintiff asserts the ALJ failed to properly consider her physical RFC (P's brief at 5). In this argument, Plaintiff contends the ALJ failed to reference what weight, if any, was given to the medical opinions of Plaintiff's treating physicians, Daniel Groblewski, M.D., a neurologist, and Cecilia Olazar, M.D., a rheumatologist (P's brief at 6).  A careful reading of the ALJ's decision reveals ALJ Benitz properly weighed the medical opinion of Dr. Groblewski as contained within his treatment notes, but there is no indication as to how he

weighed Dr. Olazar's medical opinion.  In short, Dr. Groblewski diagnosed Plaintiff with mixed tension muscle type migraine headaches with a history of myofascial pain disorder and psychosocial stress generators (Tr. 198-213), while Dr. Olazar more specifically assessed a limitation on Plaintiff's work days  to four hours per day due to her fibromyalgia (Tr. 214-15, *see also* 216-42).

The residual functional capacity is an assessment, based upon all of the relevant evidence, of a claimant's remaining ability to do work despite the claimant's impairments. 20 C.F.R. § 404.1545.  The Eleventh Circuit has noted that the focus of a RFC assessment is on the doctors' evaluations of a claimant's condition and the resulting medical consequences.  *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997).  The law of the Eleventh Circuit is very clear that a treating physician's testimony must be given substantial or considerable weight unless good cause is shown to the contrary.  *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580,583 (11th Cir. 1991); 20 C.F.R. § 404.1527(d).  If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.  20 C.F.R. § 404.1527(d)(2).  The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.  *See Edwards*, 937 F.2d at 583.

The medical evidence of record reveals Dr. Groblewski was Plaintiff's treating physician, from December 16, 2003 to January 17, 2005 (Tr. 198-213).  On the initial date of treatment, December 16, 2003, Dr. Groblewski drafted a letter to Plaintiff's primary care

6

physician, in which Dr. Groblewski indicated that he had diagnosed Plaintiff with "migraine headaches, possible mixed tension or muscle contract type and possible situational depression" (Tr. 210).  Plaintiff continued to treat with Dr. Groblewski on six more occasions and on each date of treatment Dr. Groblewski reiterated the diagnosis of migraine headaches with mixed tension (January 26, 2004, Tr. 206-07; February 18, 2004, Tr. 205; April 8, 2004, Tr. 203-04; September 29, 2004, Tr. 200; December 6, 2004, Tr. 199; January 17, 2005, Tr. 198).  Dr. Groblewski opined the nature and severity of the Plaintiff's impairments through the diagnosis, but did not report any limitations regarding an inability to work.

In his decision, the ALJ specifically referenced Dr. Groblewski's letter of December 16, 2003, to Plaintiff's primary care physician, and the diagnosis of possible mixed tension muscle type migraine headaches and possible situational depression[4] (Tr. 18).  The ALJ also referred to Plaintiff's September 29, 2004 visit to Dr. Groblewski, wherein Plaintiff was diagnosed with stable mixed migraine and tension headaches, depression, and fibromyalgia (Tr. 18-19).   In a subsequent paragraph, ALJ Benitz referenced Dr. Groblewski's medical records, but only referred to the doctor's notation that the claimant lived with her husband and daughter (Tr. 19).   The ALJ again cited Dr. Groblewski's treatment notes, but the ALJ only referred to the report that "claimant had normal muscle

---

[4]Although the ALJ indicated Dr. Groblewski diagnosed Plaintiff with "possible mixed tension muscle type migraine headaches" on December 16, 2003 (Tr. 18), Dr. Groblewski's treatment records reveal that he diagnosed Plaintiff with "migraine headaches, possible mixed tension or muscle contract type" on that date (Tr. 210).  However, in this instance such error is harmless to the decision.

bulk and tone throughout, [symetric] strength, normal reflexes and had a noataxic gait"[5] (Tr. 22).  In his decision, the ALJ accepted the diagnosis of migraine headaches and found, "the medical evidence indicates that the claimant has fibromyalgia, migraines and depression, impairments that are severe within the meaning of the Regulations" (Tr. 19).  Based on the foregoing, it is evident the ALJ considered and weighed Dr. Groblewski's treatment notes and accepted Dr. Groblewski's diagnosis.  Therefore, ALJ Benitz did not fail to properly weigh the opinion of this  treating physician.  *See Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580,583 (11th Cir. 1991).

Dr. Cecilia Olazar[6] is reported to have been Plaintiff's treating physician from June 28, 2004 through March 1, 2005 (Tr. 214-42).  At the initial date of treatment, June 28, 2004, Dr. Olazar noted Plaintiff complained of "severe pain of all joints, muscles, head, back, legs with clumsiness, cognitive dysfunction, fatigue and myalgias" (Tr. 222).  On that date Dr. Olazar also reported Plaintiff experienced "visual loss, hearing loss, anxiety/depressive disorder, chronic altered sleep patterns, hypersensitivity throughout, and chronic headaches" (Tr. 222).  At that visit Dr. Olazar confirmed the primary care

---

[5]The record reflects Dr. Groblewski found Plaintiff's gait was "nonataxic" (Tr. 210).  Through apparent typographical error, the ALJ stated "noataxic gait" (Tr. 22).  Cerebellar gait is a synonym for ataxic gait and is defined as "a wide based gait with lateral veering, unsteadiness, and irregularity of steps."  The Online Medical Dictionary at http://www.medilexicon.com/medicaldictionary.php (last visited Mar. 10, 2008).  Thus, a nonataxic gait is a normal gait.

[6]The Government argues that Dr. Olazar was not a treating physician (*see* D's brief at 12).  However, the treatment notes show Dr. Olazar saw the patient on at least four occasions over a nine month period, with other contacts noted, and thus was among the physicians "most able to provide a detailed, longitudinal picture of Plaintiff's medical impairment."  20 C.F.R. 404.1527(d)(2).  Therefore, Dr. Olazar was a treating physician.

physician's diagnosis of fibromyalgia syndrome, and highlighted the diagnosis of subclinical depression and sleep disorder, as mentioned in the past medical and surgical history form (Tr. 223).  Dr. Olazar also ordered AP spine and left femur bone density scans on that date which revealed normal bone mineralization (Tr. 223, 234-37).  Dr. Olazar further stated Plaintiff had "diffuse trigger points and allodynia throughout her paraspinals, anterior chest wall and epicondyles of upper and lower extremities" and "classical trigger points with increased allodynia[7] throughout" (Tr. 223).

On July 19, 2004, Plaintiff visited Flagler Hospital for radiology testing ordered by Dr. Olazar (Tr. 231-32).   The x-ray report of the cervical spine revealed "mild left sided bony foraminal narrowing at C6-7 related to anterior bony uncal hypertrophy" and the x-ray of the lumbosacral spine demonstrated "minimal degenerative disk changes and a question of right renal calculus" (Tr. 231-32).  On August 23, 2004, Dr. Olazar noted Plaintiff was in fair condition but still struggling with off and on intermittent pain and allodynia throughout (Tr. 220).  On that date Dr. Olazar confirmed the diagnosis of fibromyalgia, and renewed Plaintiff's prescription of Soma and Ultram, which Plaintiff had previously been prescribed by other physicians (Tr. 220).  On November 15, 2004, Plaintiff reported achiness and pain diffusely throughout all her muscles and intolerance to massage therapy (Tr. 219).  At that visit Dr. Olazar ordered laboratory tests to check the parameters of Plaintiff's inflammation (Tr. 219).  The doctor also prescribed Mobic and Robaxin because Plaintiff's symptoms were unaffected by Soma and Ultram (Tr. 219).

---

[7]Allodynia is a condition in which ordinarily non-painful stimuli elicit pain.  *See* The Online Medical Dictionary at http://www.medilexicon.com/medicaldictionary.php (last visited Mar. 10, 2008).

9

On March 1, 2005, Plaintiff was seen by Dr. Olazar in a follow-up visit where Dr. Olazar discontinued the use of Soma, Robaxin and Mobic and recommended Plaintiff maintain the present regimen prescribed by Plaintiff's neurologist, Dr. Groblewski, which appeared to be adequate (Tr. 217).  Dr. Olazar further noted Plaintiff's intolerance to the prescribed medication and her continued diffuse allodynia throughout (Tr. 217).  On that date Dr. Olazar also completed a Medical Statement Regarding Fibromyalgia for Social Security Disability and stated in her medical opinion that Plaintiff could only work four hours per day with a variety of postural limitations (Tr. 214-15).  On the form Dr. Olazar marked a plus sign indicating "pain in eleven or more pressure points"[8] and handwrote next to the standard form language "diffuse allodynia" (Tr. 214).

In his decision, ALJ Benitz referred to Dr. Olazar's initial evaluation of June 28, 2004 and the diagnosis of fibromyalgia syndrome, subclinical depression, and sleep disorder (Tr. 19).  The ALJ also stated "[a]lthough the claimant has been diagnosed with fibromyalgia, the record does not contain significant evidence in the form of clinical testing, analysis and

---

[8]The form instructs the doctor to check any of the following statements, from a list, which apply to the patient.  Dr. Olazar indicated the statements which applied to Plaintiff with a check mark in all but one instance.  To indicate that "pain in eleven or more pressure points," applied to the Plaintiff, Dr. Olazar marked a plus sign and handwrote "diffuse allodynia" next to the listed category.  This sole departure from the indicated check mark system is ambiguous as it could mean Dr. Olazar found Plaintiff to have pain in "eleven or more pressure points" and "diffuse allodynia" or solely "diffuse allodynia."

10

consistent medical treatment, as required by SSR 99-2p,[9] that her condition is as disabling as the claimant alleges regarding her vague complaints of stiffness, pain and fatigue" (Tr. 23).   Dr. Olazar was not the sole physician to diagnosis or acknowledge a diagnosis of fibromyalgia.   Dr. Fischer, Plaintiff's primary care physician, noted multiple trigger points during his physical examination on January 6, 2004 and diagnosed Plaintiff with fibromyalgia on that date (Tr. 187).   At that visit Dr. Fischer ordered a follow-up examination with a neurologist and sent Plaintiff to massage therapy (Tr. 187).   Following Dr. Fisher's diagnosis, Dr. Groblewski also acknowledged the diagnosis of fibromyalgia on January 26, 2004 (Tr. 206).   Additionally, Dr. Brito noted Plaintiff's diagnosis of fibromyalgia on September 2, 2004 (Tr. 265).   On these facts the Court finds the record contains significant evidence to support Plaintiff's complaints of pain regarding her fibromyalgia.      Although the ALJ found the treating sources did not state Plaintiff's impairments were totally debilitating or would render Plaintiff completely unemployable, (Tr. 23) Dr. Olazar noted her opinion that Plaintiff's work should be limited to four hours per day, with a variety of postural limitations (Tr. 214-15).   Dr. Olazar's findings must be specifically addressed and weighed by the ALJ.

The ALJ made general statements regarding the fibromyalgia, but failed to mention Dr. Olazar's limitations of four hours of work per day (Tr. 214-15) and failed to indicate how he weighed the medical opinion of Dr. Olazar regarding these limitations of work.

---

[9]SSR 99-2p, pertaining to chronic fatigue syndrome (CFS), recognizes considerable overlap between chronic fatigue syndrome and fibromyalgia.  It explains that individuals with CFS who have tender points confirmed with medical signs or laboratory findings, have a medically determinable impairment.  Additionally, individuals who fulfill the American College of Rheumatology criteria for Fibromyalgia, with eleven of eighteen trigger points, may also fulfill the criteria for CFS.

Case law and the Regulations provide that an ALJ may discount the opinion of a treating physician where there is good cause to do so. The Eleventh Circuit has concluded "good cause" exists when: (1) the treating physician's opinion was not bolstered by the evidence; (2) the evidence supported a contrary finding; or, (3) the treating physician's opinion was conclusory or inconsistent with the doctor's own medical records. *Phillips v. Barnhart,* 357 F.3d 1232, 1240-41 (11th Cir. 2004) (citing *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997)). An ALJ must clearly articulate his reasons for electing to disregard the opinion of a treating physician. *Id.* at 1241. For the Court to accept the ALJ's determination to give little weight to the treating physician, the Court must conclude that the determination was supported by substantial evidence. *Richardson v. Perales*, 402 U.S. 389, 390 (1971). Here, the Court is unable to ascertain what, if any, weight was given to Dr. Olazar's opinion. ALJ Benitz fails to make any reference to the Medical Statement Regarding Fibromyalgia for Social Security Disability Claim (Tr. 214-15) in his decision. Although the ALJ has wide latitude to evaluate the weight of the evidence, he must do so in accordance with prevailing precedent. In this case, the weight afforded to Dr. Olazar's opinion could very well make a difference in the physical residual functional capacity.

As it is impossible for the Court to tell if the ALJ applied the proper test in evaluating a treating physician's opinion, this case must be remanded. *See generally, Owens v. Heckler*, 748 F.2d 1511, 1515-17 (11th Cir. 1984) (declining to affirm an ALJ's decision where it was unclear what test the ALJ used in reaching his conclusions and concluding it was not proper to affirm simply because some rationale might have supported the ALJ's conclusions). On remand, the ALJ must consider the opinions of all of Plaintiff's examining and treating medical sources, as well as the opinions of non-examining medical sources,

and give the proper weight to the testimony and statements of each as required by the law

of this circuit.  *See Lewis v. Callahan,* 125 F.3d at 1440-41*; Sharfarz v. Bowen*, 825 F.2d

278, 279-81 (11th Cir. 1987).  If the ALJ finds reason to disregard the opinion of a treating

or examining physician or psychiatrist, he must provide specific reasons for doing so and

these reasons must be supported by substantial evidence in the record.

**Plaintiff's Mental Residual Functional Capacity Assessment and Medical Opinion of Plaintiff's Treating Psychiatrist**

Plaintiff asserts the ALJ failed to appropriately and properly consider her mental RFC

(P's brief at 6-8).  In this argument, Plaintiff alleges ALJ Benitz improperly rejected the

opinion of Odalys Brito, M.D., a psychiatrist, and improperly evaluated the opinion of Sherry

V. Risch, Ph.D., a psychologist (P's brief at 7-8).  Plaintiff further argues the ALJ

improperly assessed her daily living restrictions (P's brief at 7).  Contrary to Plaintiff's

contentions, a careful reading of the decision reveals the ALJ properly discredited the

medical opinion of Dr. Brito and declined to give the opinion controlling weight.  The ALJ

also properly evaluated the medical opinion of Dr. Risch.  In sum, Dr. Brito assessed

Plaintiff to have a GAF[10] score of 40 (Tr. 265) and marked difficulties maintaining social

---

[10]The Global Assessment of Functioning Scale (GAF) was designed by mental health clinicians to rate the psychological, social and occupational functioning of an individual on a mental health scale of 0-100.  A GAF score of 31-40 describes "some impairment in reality testing or communication" or "major impairment in several areas, such as work, or school, family relations, judgment, thinking, or mood."  A GAF score of 41-50 indicates "serious symptoms"and includes "impairment in social, occupational or school functioning."  A GAF score of 51-60 describes "moderate symptoms" and includes only moderate difficulty in functioning.  A GAF score of  61-70 reflects mild symptoms, with some difficulty in social and occupational functioning.  A GAF score of 71-80 indicates that if symptoms are present, they are transient and expectable reactions to psycho-social stressors with no more than slight impairment in social, occupational or school functioning. DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, DSM-IV, 32-34 (4th ed.,
(continued...)

functioning, persistence, concentration and pace (Tr. 250-51), while Dr. Risch evaluated Plaintiff's GAF score to be 65 (Tr. 131) with mild to moderate difficulties (Tr. 132).

As noted earlier, the case law and the Regulations require the ALJ to give substantial weight to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise. *Lewis v. Callahan*, *supra*, 125 F.3d at 1440. The Court takes notice that a psychiatrist is a medical doctor whose field of specialty is that of mental diseases and other mental conditions. A medical doctor is recognized as an acceptable medical source under the Regulations. *See* 20 C.F.R. § 404.1513(a). Thus, the Court finds the case law concerning the opinions of treating physicians is applicable by analogy to the opinions of treating psychiatrists. For the Court to accept the ALJ's determination to give little weight to a treating physician or psychiatrist, the Court must conclude that the determination was supported by substantial evidence. *Richardson v. Perales*, *supra*, 402 U.S. at 390.

The record reflects Plaintiff sought treatment from Dr. Brito on at least eight occasions from September 2, 2004 through February 28, 2005 (Tr. 250-65). From the onset, Dr. Brito diagnosed Plaintiff with major depressive disorder (MDD) (Tr. 265). Throughout the treatment records, Dr. Brito noted the waxing and waning of Plaintiff's mental condition (Tr. 250-65). For example, on September 2, 2004, Dr. Brito reported Plaintiff experienced mood swings, poor energy, insomnia, anger, and crying fits (Tr. 265). In the same treatment note, Dr. Brito assessed Plaintiff's current GAF score at 40 and prescribed Lexapro and Trazodone (Tr. 265). Then on September 21, 2004, Plaintiff

---

[10](...continued)
American Psychiatric Assoc. 2000).

reported progress in her mental health with the persistence of depression (Tr. 261).  At that visit Dr. Brito discontinued Plaintiff's use of Trazodone, decreased the dosage of Lexapro, and prescribed Ambien to alleviate Plaintiff's insomnia (Tr. 261).

Plaintiff returned to Dr. Brito on October 1, 2004 and described continued improvements in her mental health (Tr. 260).   On that date Dr. Brito increased the dosage of Lexapro (Tr. 260).   On October 29, 2004, during a follow-up visit, Plaintiff reported experiencing "some bad days" and feeling stressed regarding a confrontation among her family members (Tr. 259).  Dr. Brito increased the dosage of Ambien at that visit (Tr. 259). Plaintiff's condition appeared to deteriorate on November 29, 2004 as she reported feeling depressed, suffering from a decreased appetite, crying sometimes, and having sporadic sleep difficulties (Tr. 258).   As a result of Plaintiff's mental condition Dr. Brito again increased the dosage of Lexapro (Tr. 258).

On December 6, 2004, Dr. Brito completed a Treating Psychiatrist's or Psychologist's Statement in which she assessed Plaintiff's condition from September 2, 2004 through December 6, 2004 (Tr. 250-54).   Dr. Brito indicated Plaintiff suffered from MDD and had marked difficulties in maintaining social functioning; marked difficulties maintaining concentration, persistence or pace; and repeated episodes of decompensation (Tr. 250-51).  Dr. Brito also completed an Addendum to Medical Assessment of Ability to Perform Work-Related Activities (Mental) in which she assessed Plaintiff had a substantial loss making work related decisions, a substantial loss responding to usual work related situations, a substantial loss dealing with changes in a routine work setting, an extreme loss responding appropriately to supervisors, and a slight loss responding appropriately to co-workers (Tr. 254).

15

On December 28, 2004 Plaintiff's condition appeared to improve as her sleeping patterns and appetite improved (Tr. 256).  Plaintiff also reported that her depression was seventy-five percent improved (Tr. 256).  At that visit Dr. Brito prescribed Premarin (Tr. 256).  Then on February 28, 2005, Plaintiff noted a decrease in her mental health as her sleep again became irregular, she felt easily overwhelmed, and she had difficulties handling her stress (Tr. 255).

ALJ Benitz stated he did not accept the opinion of Dr. Brito[11] that Plaintiff had "marked difficulties in maintaining social functions and maintaining concentration persistence or pace and repeated episodes of decompensation, each of extended duration; had a residual disease that has resulted in such marginal adjustment that even a minimal increase in mental demands in the environment would be predicted to cause the individual to decompensate" (Tr. 20).  The ALJ specifically discounted the report of Dr. Brito because he found the opinion conflicted with the substantial evidence of record, documenting less severe limitations; the medical records indicated no documentation of decompensation; and the doctor did not adequately consider the entire record of collateral sources and objective findings of other treating physicians (Tr. 21).

Substantial evidence supports the ALJ's factual finding that Dr. Brito's opinion was inconsistent with the evidence in the record, including the collateral sources and other treating physicians.

---

[11]Inexplicably, Defendant argues that Dr. Brito was not a treating physician (D's brief at 11). Dr. Brito saw Plaintiff on eight occasions over a five month period.  See 20 C.F.R. 404.1527(d)(2) for a discussion factors in considering the nature of the medical relationship. Although the ALJ discounted the opinion of Dr. Brito, his consideration of Dr. Brito's opinion implies he found Dr. Brito was a treating physician.

16

Social functioning refers to a person's "capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals." 20 C.F.R. § 404 subpt. P., app. 1, at 12.00(C)(2).  The SSA Regulations contemplate demonstration of impaired social functioning by presenting evidence of "altercations, evictions, firings, fear of strangers, avoidance of interpersonal relationships, or social isolation." *Id.*  Also, the Regulations suggest it is possible to "exhibit strength in social functioning." *Id.* (listing "such things as [the Plaintiff's] ability to initiate social contacts with others, communicate clearly with others, or interact and actively participate in group activities").

Plaintiff exhibited strength in her social functioning.  For example Dr. Brito's treatment notes reflect Plaintiff working on her interpersonal relationship with her husband (Tr. 255, 257, 258, 260) and enjoying time with her children (Tr, 203, 261).  Plaintiff also allowed her son and daughter to live in her home for limited periods of time, further developing her interpersonal relationships (Tr. 203, 261).  Additionally Plaintiff enjoyed playing with her granddaughter; (Tr. 203) however, extended visits with Plaintiff's grandchildren caused stress because the children's noise sometimes brought on migraine headaches (Tr. 255, 257).  Plaintiff also enjoyed visiting and talking on the phone with friends (Tr. 130).

Although Plaintiff spent time with her family, she was not involved in any social groups (Tr. 331).  Plaintiff exhibited some impaired social functioning by spending most of her days alone (when her children were not living with her) (Tr. 330).  Plaintiff also exhibited tearful conduct during her visits to Dr. Groblewski (Tr. 206) and Dr. Risch (Tr. 132), which affected her ability to communicate.  However, Dr. Risch found Plaintiff's speech to be clear, her pronunciation good, and noted there were no deficits with

17

expressive or receptive language (Tr. 131).  Dr. Risch further noted Plaintiff had appropriate interpersonal skills, but her current depression would interfere with her ability to interact with coworkers, supervisors, and the public (Tr. 132).  Although Plaintiff exhibited some impairment in social functioning, substantial evidence supports the ALJ's finding that the difficulties only resulted in mild limitations, not marked difficulties which Dr. Brito assessed.

Concentration, persistence or pace refers to the "ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks."  20 C.F.R. § 404 subpt. P., app. 1, at 12.00(C)(3).  Here, the record supports the ALJ's finding that Plaintiff had a moderate impairment in her ability to concentrate.  Dr. Brito's treatment notes indicated Plaintiff getting a new hair cut and color (Tr. 256) and Dr. Risch's records reflect  Plaintiff's overall grooming and hygiene were good (Tr. 131), which signified an ability to complete simple tasks without extra supervision or assistance.  Dr. Risch further found Plaintiff exhibited problems with working memory, but assessed that Plaintiff had the cognitive resources with which to learn job skills and follow simple directions (Tr. 132).  Dr. Risch also assessed Plaintiff to potentially have problems learning complex skills and following detailed directions, and maintaining persistence and pace when experiencing head pain (Tr. 132). The ALJ properly found Plaintiff's limitations indicated moderate impairment maintaining concentration, persistence, or pace, not marked impairment as Dr. Brito opined.

Substantial evidence also supported the ALJ's determination that Plaintiff did not suffer extended periods of decompensation.  Plaintiff has not been  hospitalized for her

mental impairment, she has not received significant active care,[12] and she did not receive significant increases or changes in her prescribed medication reflective of an uncontrolled condition (Tr. 23).[13]

Thus, in accordance with the law of this circuit, good cause existed to discount Dr. Brito's opinion.

The record reflects the SSA sent Plaintiff to Dr. Risch on September 2, 2003 for an independent psychological evaluation (Tr. 129-32). Dr. Risch assessed Plaintiff with a GAF score of 65 (Tr. 65), which reflects mild symptoms with some difficulty in social and occupational functioning. *Diagnostic and Statistical Manual of Mental Disorders*, DSM-IV, 32-34 (4th ed., American Psychiatric Assoc. 2000). Dr. Risch indicated Plaintiff was tearful throughout the evaluation and that she would benefit from continued mental health treatment (Tr. 131). Dr. Risch further found that Plaintiff would have problems with her reliability and predictability, given her complaints of frequent headaches (Tr. 131).[14]

---

[12]Plaintiff treated with Dr. Baringer (Tr. 71-114), Sandra Haynes, LCSW (Tr. 151-58), and Dr. Brito (Tr. 250-66) for her mental health. Plaintiff did not see Dr. Brito on a regular basis to provide significant active care; the intervals between Plaintiff's treatments were occasionally only one week, but also extended up to two months (*see* Tr. 250-66).

[13]Dr. Brito prescribed Lexapro, Trazodone, Ambien, and Premarin to Plaintiff during her treatment. Dr. Brito discontinued the usage of Trazodone after a short period of time and increased and decreased the doses of Lexapro and Ambien depending on Plaintiff's mental condition. These changes in medication do not indicate a "significant alteration in medication" as described in 20 C.F.R. Pt. 404, Subpt. P, App. 1.

[14]Plaintiff in her brief stated "Dr. Risch furthered [sic] opined that she [Plaintiff] would not be reliable or predictable because her mental health problems would interfere with her ability to interact with coworkers and supervisors" (P's brief at 4). However, Dr. Risch actually reported "[g]iven her complaints of frequent headaches, she [Plaintiff] would have problems with reliability and predictability" (Tr. 132). Additionally, Dr. Risch expressed that Plaintiff "has appropriate interpersonal skills, but her current depression would interfere with (continued...)

Additionally, Dr. Risch expressed that Plaintiff was unable to complete all aspects of the medical status evaluation due to tearfulness (Tr. 132).

Plaintiff contends that these statements, and the report in its entirety, reveal a higher degree of restrictions than Dr. Risch assessed in Plaintiff's GAF score and that the ALJ did not properly evaluate the findings (P's brief at 7-8).  However, Dr. Risch's findings were consistent with the ALJ's determination of Plaintiff's impairments.  ALJ Benitz considered the medical opinions of Susan Conley, Ph.D. and Alejandro F. Vergara, M.D. in assessing Plaintiff's mental RFC, but the ALJ also considered the opinion of Dr. Risch.  The ALJ noted Dr. Risch's assessed GAF score (Tr. 18) as well as Dr. Risch's findings regarding Plaintiff's cognitive abilities and interpersonal skills (Tr. 22).  Accordingly, the Court finds the ALJ gave proper consideration to the opinion of Dr. Risch.

Plaintiff also asserts the ALJ assessed no restrictions of daily living to Plaintiff because she could perform some housework (P's brief at 7).  However, a close reading of ALJ Benitz's opinion reveals otherwise.  In this instance, when evaluating Plaintiff's credibility, the ALJ considered the activities of daily living to which Plaintiff testified and which Plaintiff stated to her medical sources (Tr. 130, 203, 226, 261, 330-34).  Her activities of daily living were among the factors the ALJ considered when assessing Plaintiff's credibility about the disabling nature of her impairments.

The Eleventh Circuit has found that participation in everyday activities of short duration, such as housework, does not disqualify a Plaintiff from disability benefits.  *Lewis*

---

[14](...continued)
her ability to interact with coworkers and supervisors" (Tr. 132).  The Court concludes Plaintiff somewhat overstated Dr. Risch's impressions and recommendations.

*v. Callahan*, 125 F.3d 1436, 1441 (11th Cir. 1997).  Thus, an ALJ may not rely solely on a

Plaintiff's activities of daily living when determining whether that individual retains the

capacity for work.  *See Foote v. Chater*, 67 F.3d 1553, 1561 (11th Cir. 1995) (an ALJ's

citation to a claimant's testimony about her daily living activities is not sufficient support to

disregard the claimant's statements of disabling pain).  Under the Regulations, however,

the ALJ may consider household and social activities in evaluating claims of disabling

symptoms.  20 C.F.R. § 404.1529(c)(3)(i); *see also Macia v. Bowen*, 829 F.2d 1009, 1012

(11th Cir. 1987).  Activities of daily living are not necessarily medical evidence that proves

a particular residual functional capacity, but are to be considered where, as here, a

claimant has subjective symptoms and the claimant's credibility is crucial to the disability

determination.  *See Foote v. Chater*, 67 F.3d at 1562; 20 C.F.R. § 404.1529(a),(b).

The ALJ found Plaintiff to have no restrictions of activities of daily living (Tr. 19).

The ALJ cited to Dr. Risch's treatment notes[15] and Plaintiff's testimony when listing

Plaintiff's activities of daily living (Tr. 19).  Plaintiff also indicated to Dr. Groblewski that she

worked outside, exercised, quilted, played with her granddaughter, and enjoyed listening

to Christian radio stations (Tr. 203).  In Dr. Olazar's patient history form Plaintiff wrote that

---

[15]Although the ALJ listed the activities of daily living Plaintiff testified to at the hearing
and reported to Dr. Risch, ALJ Benitz failed to indicate that Plaintiff also reported she could
not complete the activities on days she was having a migraine headache (Tr. 130).  Dr.
Risch stated, "[s]he [Plaintiff] spends her days depending on her health state.  She does
her own household chores.  When she does not have a headache, she does the cooking
and grocery shopping . . . laundry" (Tr. 130).  At the hearing Plaintiff testified that when she
has a headache she does not do any household chores (Tr. 330).  However, when Plaintiff
does not suffer from a headache she testified that she can make the bed, cook supper,
garden, quilt for approximately thirty minutes, go grocery shopping with her husband's
assistance, and pay bills with her husband's help (Tr. 330-34).

she exercised sometimes by walking and swimming (Tr. 226).  Plaintiff also indicated to Dr. Brito that she went on a trip for thirteen days (Tr. 261).

Although Plaintiff indicated she cannot perform activities of daily living when she has a headache (Tr. 130, 330-34), the ALJ found Plaintiff's symptoms were not as limiting as the Plaintiff alleged (Tr. 22).  The ALJ found that Plaintiff has received medical treatment for her migraines, and the overall evidence suggests that the Plaintiff has the ability to care for herself and maintain her home (Tr. 23).  In this case the adverse credibility determination is supported by substantial evidence.  Even if the ALJ failed to mention the differences in daily living on days when Plaintiff was having a headache, the record as a whole confirms that the error was harmless as the ALJ properly discounted Plaintiff's credibility.  *See Allen v. Sullivan*, 880 F.2d 1200, 1203 (11th Cir. 1989).

## Conclusion

For the reasons stated herein, the decision of the Commissioner is **REVERSED** pursuant to sentence four of 42 U.S.C. 405(g). The case is **REMANDED** for additional proceedings consistent with this Order and Opinion. The medical evidence must be correctly weighed in accordance with the Regulations and prevailing case law, and Plaintiff's residual functional capacity must be reassessed.  On remand, the ALJ may reopen the record and accept any additional evidence deemed appropriate.

## Directions as to Judgment

The Clerk of Court is directed to enter judgment consistent with this Order and Opinion, and thereafter to close the file.  The judgment shall state that if Plaintiff were to ultimately prevail in this case upon remand to the Social Security Administration, any

22

motion for attorney fees under 42 U.S.C. § 406(b) must be filed within fourteen (14) days of the Commissioner's final decision to award benefits.  *See Bergen v. Commissioner of Social Security*, 454 F.3d 1273, 1278 (11th Cir. 2006); *compare* Fed. R. Civ. P. 54(d)(2)(B); M.D. Fla. Loc. R. 4.18(a).

      **DONE AND ORDERED** at Jacksonville, Florida this 20th  day of March, 2008.


Copies to all counsel of record

                   **THOMAS E. MORRIS**
                   United States Magistrate Judge

23